IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00508-PSF-MJW

APARTMENT INVESTMENT AND MANAGEMENT COMPANY (AIMCO),

     Plaintiff,

v.

NUTMEG INSURANCE COMPANY,

     Defendant.

---

**RECOMMENDATION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON BREACH OF THE DUTY TO DEFEND
(Docket No. 31)**

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

     Before the Court is Plaintiff Apartment Investment and Management Company's

("AIMCO's") Motion for Partial Summary Judgment on Breach of the Duty to Defend

(Docket No. 31), filed on September 21, 2006.  Defendant Nutmeg Insurance Company

("Nutmeg") filed a response on December 1, 2006 (Docket No. 59), and plaintiff replied

on December 11, 2006 (Docket No. 60).  The court has reviewed the parties'

arguments, the record, and the applicable law.  The court now being fully informed

makes the following findings of fact, conclusions of law, and recommendation.

I.     **BACKGROUND**

AIMCO, the plaintiff in this insurance coverage dispute, is a self-administered and self-managed real estate insurance trust ("REIT") engaged in the acquisition, ownership, management, and redevelopment of apartment properties.  Ex. 1 to Pl.'s Br., ¶ 3.  Nutmeg issued professional liability insurance policies to AIMCO—Miscellaneous Professional Liability Policy Nos. NPG0150962 and 00PG0150962 (the "Policies")— which are the subject of this case.[1]  AIMCO's claims arise out of Nutmeg's denial of coverage to AIMCO under the Policies with regard to seven third-party lawsuits against AIMCO that were tendered to Nutmeg for defense and indemnity.

The relevant portions of the Policies are as follows:

I.     **INSURING AGREEMENT**

This Policy affords the following coverage:

The Company [Nutmeg] will pay on behalf of the **Insured** all sums in excess of the Deductible amount stated in the Declarations which the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** resulting from **Claims** first made against the **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, as a result of a **Wrongful Act** by the **Insured** or any **Entity** for whom the **Insured** is legally liable, provided that such **Wrongful Act** was committed on or after the **Retroactive Date** and before the end of the **Policy Period**.
. . . .

III.    **TERRITORY, DEFENSE, CONSENT AND SETTLEMENT**

. . . .

_____

[1] The first policy (the "NPG Policy") took effect on November 20, 1998 for a two-year policy period, Ex. 2 to Pl.'s Br., and was extended on November 20, 2000 until November 20, 2002.  *Id.* at Ex. 3.  The second policy (the "OOPG Policy") had an effective date of November 20, 2002, and extended until September 1, 2003.  *Id.* at Ex. 4.  All of the lawsuits at issue were filed in 2002 or 2003, so the extension to the NPG Policy and the OOPG Policy are the pertinent Policies.  For simplicity, when citing to policy provisions, the Court will cite only to Exhibit 3, which is the extension to the NPG Policy, unless there is a substantive difference in the language of the provisions.

The Company has the sole right to appoint defense counsel and the right and duty to defend any **Claim** made against the **Insured**.
. . . .

## V.      DEFINITIONS

1.      **"Claim"** means receipt by the **Insured** of a written demand naming the **Insured** seeking **Damages**, **Professional Services**, or **Equitable Relief** arising out of a **Wrongful Act** by the **Insured** or any **Entity** for whom the **Insured** is legally liable.

A **Claim** is considered first made when the **Insured** receives notice of **Claim** from a claimant or such claimant's legal representative, or when deemed to be made pursuant to Condition (A) and/or Condition (B) of this Policy.

2.      **"Claims Expenses"** means (a) reasonable and necessary fees charged by an attorney(s) designated by the Company to defend a **Claim**, and (b) all other fees, costs and charges resulting from the investigation, adjustment, defense, and appeal of a **Claim**, if incurred by the Company. . . .

3.      **"Damages"** means a compensatory monetary amount for which the **Insured** may be held legally liable, including judgments (inclusive of any pre- or post-judgment interest), awards, or settlements negotiated with the approval of the Company. . . .

. . . .

6.      **"Entity"** means any individual, partnership, or corporation other than the **Insured**.

7.      **"Equitable Relief"** means a remedy not involving the payment of monetary damages.

. . . .

9.      **"Insured"** means only the following:

(a)      The Named Insured designated in Item 1 of the Declarations [AIMCO] or by endorsement to this Policy;

(b)      Any person who is, was, or hereafter becomes a partner, principal, officer, director, member, or

3

employee of the Named Insured, but only while acting on behalf of the Named Insured;

. . . .

      (e)    Any **Subsidiary**.

. . . .

**14.**    **"Professional Services"** means those services set forth in Item 7 of the Declarations requiring special learning or intellectual skill, performed by the **Insured** in the ordinary conduct of its profession for others for a fee, remuneration or other consideration; or as otherwise defined by endorsement to this Policy.

. . . .

**16.**    **"Subsidiary"** means any entity identified in the application for this Policy in which at the time of its **Wrongful Act**, the Named Insured had an ownership interest of greater than 50%. . . . .

**17.**    **"Wrongful Act"** means any actual or alleged act, error or omission in the rendering of or failure to render **Professional Services**.

Ex. 3 to Pl.'s Br., at AIMCO-PL0004–PL0007.

Endorsement 6 to the Policy amends the definition of "Insured" to also include:

    (f)    any independent contractor, when the Named Insured has agreed in writing to provide insurance for the independent contractor's professional services, but only for **Professional Services** as specified in ITEM 7 of the Declarations which were rendered, or which should have been rendered by or for the **Insured** named in ITEM 1 of the Declarations [AIMCO], and which are otherwise covered by this Policy.

*Id.* at AIMCO-PL0019. Finally, ITEM 7 of the Declarations, which sets forth the

particular services included in the definition of "Professional Services," states:

**ITEM 7.**    PROFESSIONAL SERVICES:  Solely in the performance of providing professional services as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager,

insurance administrator, real estate investment advisor for others for a fee.[2]

*Id.* at AIMCO-PL0003.

The seven lawsuits (the "Lawsuits") tendered by AIMCO to Nutmeg for defense and indemnity pursuant to the Policies include:[3]

!     *Cananwill, Inc. v. AIMCO, et al.* (the "Cananwill Complaint"), filed in the Superior Court of New Jersey, Morris County, Civil Action No. MRSL-3549-02.  Ex. 5 to Pl.'s Br.

!     *WestRM–West Risk Markets, Ltd. v. Lumbermens Mut. Cas. Co., et al.* (the "WestRM Complaint"), filed in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 7344.  Ex. 6 to Pl.'s Br.

!     *Lumbermens Mut. Cas. Co. & Universal Bonding Ins. Co. v. AIMCO, et al.* (the "Lumbermens Complaint"), filed in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 9704.  Ex. 7 to Pl.'s Br.

!     *Highlands Ins. Co. v. Cananwill, Inc., et al.* (the "Highlands Complaint"), filed in the Superior Court of New Jersey Law Division, Morris County, Civil Action No. MRSL-1874-03, consolidated with Civil Action No. MRSL-3549-02.  Ex. 9 to Pl.'s Br.

!     *Basic Capital Mgmt., Inc. & Transcontinental Realty Investors, Inc. v. AIMCO, et al.* (the "Basic Capital Complaint"), filed in the 68th Judicial District of Texas, Dallas County, Civil Action No. 03-9530.  Ex. 11 to Pl.'s Br.

!     *AIMCO v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., et al.* (the "First Capital Counterclaim"), filed in the United States District Court for the District of Colorado, Civil Action No. 01-M-2018.  Ex. 13 to Pl.'s Br.

---

[2] Although not relevant to this Order, Item 7 of the OOPG Policy, effective November 20, 2002 to September 1, 2003, also includes "tax fund management services" in the definition of "Professional Services."  Ex. 4 to Pl.'s Br., at AIMCO-PL0570.

[3] The allegations stated in the complaints in these Lawsuits will be discussed in the Analysis section below.

! *AIMCO v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., et al.* (the "National Union Counterclaim"), filed in the United States District Court for the District of Colorado, Civil Action No. 01-M-2018.  Ex. 15 to Pl.'s Br.[4]

AIMCO tendered all of the claims identified above to Nutmeg for defense and indemnity coverage under the Policies, and Nutmeg denied coverage for all seven.  Pl.'s Br., Exs. 8, 10, 12, 14, 16.

On February 28, 2006, AIMCO filed a complaint against Nutmeg in Denver County District Court, bringing the following causes of action:  (1) a declaratory judgment that Nutmeg was obligated to defend and indemnify AIMCO in the Lawsuits; (2) breach of contract; (3) willful breach of contract; and (4) bad faith breach of insurance contract.  On March 22, 2006, Nutmeg filed a notice of removal (Dkt. # 1), removing the case to federal court under 28 U.S.C. § 1441 on diversity grounds.  AIMCO now moves for partial summary judgment solely on the issue of whether Nutmeg had a duty to defend AIMCO in each of the Lawsuits.  The issues of Nutmeg's duty to indemnify AIMCO and the damages AIMCO is entitled to, if any, are not before the Court.  Nor will the Court consider at this point the issues of whether AIMCO provided timely notice of the Lawsuits to Nutmeg and whether the claims were made within the policy periods.[5]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  F.R.Civ.P. 56(c);

---

[4] The sixth and seven suits are the same action, but they involve claims by two different counterclaim defendants.

[5] Nutmeg indicates in its response that it will be filing a Cross-Motion for Summary Judgment on these issues as well as the duty to defend issue.  Def.'s Resp. at 18 n.17.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party.  *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).

## IV.    ANALYSIS

### A.    Insurer's Duty to Defend

An insurer's duty to defend its insured is distinct from, and broader than, its duty to indemnify.  *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 & n.5 (Colo. 1991) ("*Hecla*").  The duty to defend arises when the underlying complaint against the insured "alleges any facts that might fall within the coverage of the policy." *Id.*  Thus, the duty to defend is triggered when the "allegations in the complaint, . . . if sustained, would impose a liability covered by the policy."  *Id.*; *see also Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (insurer has a duty to defend "if the alleged facts even potentially trigger coverage under the policy").  To demonstrate the existence of a duty to defend, "the insured need only show that the underlying claim may fall within policy coverage," while to avoid the duty to defend "the insurer must prove that [the claim] cannot" be covered.  *Hecla*, 811 P.2d at 1089.

Whether an insurer has a duty to defend a particular claim is a question of law. *Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999).  In evaluating whether a duty to defend exists, the court must compare the allegations in the complaint with the terms of the insurance contract.  *See Hecla*, 811 P.2d at 1089; *Cyprus Amax Minerals Co.*, 74 P.3d at 299.  If the allegations "state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of

7

recovery within the policy coverage has been pleaded," then the insurer owes a duty to defend its insured against the underlying claim.  *Hecla*, 811 P.2d at 1089.

The interpretation of insurance contracts, necessary in evaluating the issue of an insurer's duty to defend, is a question of law for the court.  *American Std. Ins. Co. v. Savaiano*, 298 F. Supp. 2d 1092, 1094 (D. Colo. 2003) (citing *Peterman v. State Farm Mut. Auto. Ins. Co.*, 8 P.3d 549 (Colo. App. 2000)).  Insurance policies are interpreted in accordance with general principles of contract interpretation and accordingly must be construed to ascertain and effectuate the mutual intent of the parties.  *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 502 (Colo. 2004); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984).  An unambiguous contract should thus be enforced according to the plain and generally accepted meaning of its language.  *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 256, 577 P.2d 748, 750 (Colo. 1978).  Ambiguous language must be construed in favor of the insured and against the insurer who drafted the policy.  *Browder v. U.S. Fidelity & Guar. Co.*, 893 P.2d 132, 133 (Colo. 1995).  Generally, coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage.  *Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1327 (Colo. App. 1994).

### B.    Nutmeg's Duty to Defend AIMCO Against the Lawsuits

Because a determination of Nutmeg's duty to defend requires a comparison of the allegations in the Lawsuit complaints and the provisions in the Policies, it is necessary to resolve the issue with regard to each one of the Lawsuits.  Thus, the allegations in all seven complaints will be examined separately.

8

Before turning to the complaints, however, the Court will resolve a significant disagreement between the parties regarding the interpretation of the term "Professional Services" as defined in the Policies.  Nutmeg contends that the term only includes services provided "for others for a fee."  Def.'s Resp. at 16 (quoting Policies, Item 7 & Def. of "Professional Services").  AIMCO contends (1) because Endorsement 6 includes independent contractors in the definition of "Insured," the term "others" in the definition of "Professional Services" can include AIMCO when the services are provided for AIMCO by an independent contractor, and (2) that Endorsement 6 modifies the term "Professional Services" to eliminate the requirement that the services be provided "for others for a fee, remuneration or other consideration."  Pl.'s Reply at 9-10, 14-15.

The Court first addresses the meaning of the term "others."  The term "Professional Services" is defined in pertinent part as "those services set forth in Item 7 of the Declarations requiring special learning or intellectual skill, performed by the **Insured** in the ordinary conduct of its profession for others for a fee, remuneration or other consideration."  Policy, Ex. 3 to Pl.'s Br., § V(14).  In turn, Item 7 limits the term to services "[s]olely in the performance of providing professional services as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager, insurance administrator, real estate investment advisor for others for a fee." *Id.* at AIMCO-PL0003.  Included in the definition of "Insured" are AIMCO, AIMCO's officers and employees acting on its behalf, AIMCO's subsidiaries, and independent contractors with respect to "Professional Services" that were rendered, or that should have been rendered, by or for AIMCO.  *Id.* § V(9) & AIMCO-PL0019.

AIMCO may not, as it contends, be considered an "other" under any circumstances for purposes of the coverage grant.  By the plain terms of the Policies, Professional Services must be performed by the "Insured" for others.  Thus, under the Policies an entity is either an "Insured" or an "other," but cannot be both.  Thus, if AIMCO qualifies as an "Insured," which it clearly does, it cannot also qualify as an "other."  The fact that an independent contractor can also constitute an "Insured" does not change the analysis.  Services performed by one Insured (an independent contractor) for another Insured (AIMCO) have not been provided to "others" for purposes of determining whether there is coverage under the Policies.

AIMCO's second argument regarding the effect of Endorsement 6 on the definition of "Professional Services" is also without merit.  AIMCO claims Endorsement 6 modifies the term to mean "those services set forth in Item 7 of the Declarations requiring special learning or intellectual skill, rendered by or for the **Named Insured** named in ITEM 1 of the Declarations."  Pl.'s Br. at 14-15 (emphasis omitted).  However, Endorsement 6 simply amends the definition of "Insured" to include independent contractors with respect to Professional Services that were rendered or should have rendered by or for AIMCO.  Ex. 3 to Pl.'s Br., at AIMCO-PL0019.  It does not purport to modify the definition of "Professional Services," nor does it do so except to the extent independent contractors may now render such services as an "Insured."  The requirement in the definition of "Professional Services" that the services be rendered "for others for a fee, remuneration or other consideration" remains in place, notwithstanding Endorsement 6 to the Policies.

With those rulings in mind, the Court turns to the individual complaints in the Lawsuits and Nutmeg's duty to defend.

### 1.      The Cananwill Complaint

The Cananwill Complaint contains allegations against AIMCO for failure to pay the balance due under a premium finance agreement ("PFA").  Ex. 5 to Pl.'s Br., ¶ 115. It alleges Mr. Ray Baldwin negotiated the loan from Cananwill and executed a PFA on AIMCO's behalf.  *Id.* ¶¶ 32 & 119.  The money obtained from the loan was allegedly used to pay premiums for insurance provided to AIMCO by National Union Insurance Company of Pittsburgh, PA ("National Union").  *Id.* ¶¶ 37, 44.  The Insured on the policy was identified as "Apartment Investment Mgmt. Co/Real Estate Risk Mgmt LLC."  *Id.* ¶ 46(a).  AIMCO also obtained and provided to Cananwill guaranty bonds relating to the PFA.  *Id.* ¶¶ 67-72.  AIMCO defaulted on the PFA payments, *id.* ¶¶ 95-99, and Cananwill sued AIMCO and others, bringing causes of action against AIMCO for breach of contract, unjust enrichment, estoppel, and a declaratory judgment as to the validity of the PFA and the bonds, and whether certain agents acted on behalf of AIMCO.  *Id.* ¶¶ 112-40.

Nutmeg contends, as it does with regard to the remaining Lawsuits as well, that there are no allegations that AIMCO was procuring insurance, loans, and/or bonds to benefit others, or that AIMCO provided such services to others for a fee.  Def.'s Resp. at 3.  Rather, Nutmeg argues, the complaint only addresses conduct arising out of AIMCO's internal business operations.  *Id.*

The question for purposes of coverage is whether the allegations in the complaint assert that AIMCO is liable to Cananwill as a result of a "Wrongful Act" committed by the

"Insured" (essentially AIMCO, its officers and employees, and independent contractors). *See* Ex. 3 to Pl.'s Br., § I.  A "Wrongful Act" is an "actual or alleged act, error or omission in the rendering of or failure to render 'Professional Services.'"  Thus, the issue is whether AIMCO's alleged failure to repay a loan ostensibly obtained for the purpose of paying insurance premiums constitutes an act, error, or omission in the rendering of "Professional Services," which includes services AIMCO provided to others for a fee as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager, insurance administrator, or real estate investment advisor.

The complaint does not address why AIMCO had obtained insurance from National Union, or whether it was paid a fee for doing so.  The complaint does state that the insurance was provided "to AIMCO," that "Apartment Investment Mgmt Co/Real Estate Risk Mgmt LLC" was identified in the policy as the Insured, and that there were signatures of two individuals on the policy who signed for AIMCO.  Ex. 5 to Pl.'s Br., ¶¶ 44, 46.  These allegations unequivocally support Nutmeg's assertion that, according to the complaint, Nutmeg entered into the PFA in the context of obtaining insurance for itself, and not for others for a fee.  Although the *Hecla* standard is a strict one, the allegations in the Cananwill Complaint are insufficient to trigger Nutmeg's duty to defend.  Accordingly, AIMCO is not entitled to partial summary judgment on its claim that Nutmeg owed a duty to defend it against the claims in the Cananwill Complaint.

## 2.    The WestRM Complaint

In the WestRM Complaint, the guarantors of certain financing agreements alleged that AIMCO participated in a fraudulent scheme to benefit itself through

12

obtaining financing, secured by surety bonds, that AIMCO falsely represented would be used to pay insurance premiums. Ex. 6 (Part 2) to Pl.'s Br., ¶¶ 4-5. AIMCO allegedly used the funds to fuel a Ponzi scheme rather than pay the insurance premiums for which it ostensibly needed the financing. *Id.* ¶ 5. The complaint asserts that AIMCO is a publicly traded owner and operator of apartment homes. *Id.* ¶ 33. Keeping its insurance down and managing the risks and losses associated with property ownership and management is of critical importance to AIMCO's business. *Id.* ¶ 34. AIMCO authorized Ray Baldwin to create, implement and manage a coordinated insurance and risk management program. *Id.* ¶ 38. AIMCO allegedly gave Baldwin the tools to make sure the entities that became involved with AIMCO's insurance program accepted Baldwin as AIMCO's duly authorized representative. *Id.* ¶ 43. Baldwin collaborated with others on AIMCO's behalf to design and develop a multi-family real estate insurance program for AIMCO and others. *Id.* ¶ 49. Through Baldwin, AIMCO procured insurance policies and added additional insureds thereto that had no relationship to AIMCO, in violation of the terms of the policies. *Id.* ¶¶ 50-53, 77, 82-84. As a result, AIMCO reduced the cost of its own insurance, which was effectively subsidized by the unaffiliated insureds who were paying higher rates than AIMCO. *Id.* ¶¶ 52, 54, 83. AIMCO cancelled one policy shortly after its inception when "irregularities in the purported scope of coverage came to light as the unaffiliated insureds began suffering losses." *Id.* ¶¶ 69-70.

The third-party plaintiff guarantors in this case entered into an indemnity agreement with AIMCO and issued bonds to secure financing that was ostensibly used to pay premiums on one of AIMCO's insurance policies. *Id.* ¶¶ 87, 89, 115-17. AIMCO

then obtained additional financing from WestRM and secured new bonds from the guarantors to secure the new PFA. *Id.* ¶¶ 171-74.  When AIMCO failed to make a required payment, WestRM commenced this litigation, demanding payment from the guarantors under the bonds. *Id.* ¶¶ 191-92.  The district court granted summary judgment for WestRM, finding that AIMCO and another party owed WestRM certain amounts and had refused to pay, thus triggering the guarantors' liability under the bonds. *Id.* ¶ 194.  The guarantors then filed third-party claims against several parties, including AIMCO. *See generally* Ex. 6, Part 2 of Pl.'s Br.

The underlying allegations in the WestRM Complaint are somewhat similar to those in the Cananwill complaint in that they involve AIMCO's default under premium financing agreements that were secured by bonds and allegedly obtained for payment of insurance policy premiums.  However, the WestRM Complaint discusses AIMCO's actions in developing an insurance program for itself "and others." Ex. 6 (Part 2) to Pl.'s Br., ¶ 49.  In addition, there are allegations that AIMCO made false representations to obtain insurance policies by adding unaffiliated entities as insureds. *Id.* ¶¶ 52-53, 82-84.  Nutmeg states summarily in a footnote that "[t]hese [unaffiliated] insureds do not qualify as others to whom services were provided for a fee," but it is unclear why that is necessarily the case given that, under *Hecla*, there must only arguably be coverage. Def.'s Resp. at 4 n.6.  Under *Hecla*, Nutmeg owed AIMCO a duty to defend it in the WestRM litigation.  It is certainly possible based on the above allegations that the insurance policies in question were obtained and financed as part of AIMCO's provision of services as a property manager or insurance administrator.  Thus, the allegations of fraud surrounding the policies were arguably acts committed in AIMCO's rendering of

14

"Professional Services" such that Nutmeg had a duty to defend AIMCO pursuant to *Hecla*. AIMCO is accordingly entitled to partial summary judgment on this claim as to Nutmeg's duty to defend.

### 3.   The Lumbermens Complaint

The Lumbermens Complaint generally alleges that AIMCO and other defendants created an illegal insurance program in which an insurance policy was issued to AIMCO, and other unaffiliated companies were added as additional named insureds under the pretext that they would be receiving advantageous premium rates and coverages. Ex. 7 to Pl.'s Br., ¶ 1. The specific allegations are as follows. In connection with AIMCO's ownership and management of properties throughout the United States, AIMCO requires general liability and property insurance. *Id.* ¶ 13. Keeping insurance costs down is of major importance to AIMCO. *Id.* Ray Baldwin set up AIMCO's risk management department and was responsible for purchasing AIMCO's insurance. *Id.* ¶ 14. Baldwin hired Swain & Baldwin and Lockton, among others, to serve as AIMCO's insurance brokers. On behalf of AIMCO, *id.* ¶ 15, Baldwin collaborated with an insurance agent, Vito Gruppuso, on the design and development of a multi-family real estate insurance program for AIMCO (the "AIMCO Program"), through which Baldwin and his company would receive substantial commissions and AIMCO would benefit by being charged lower insurance premiums through a scheme under which unaffiliated insureds, contrary to the terms of the insurance policy and in violation of law, would be added as additional insureds to subsidize AIMCO's insurance costs. *Id.* ¶ 19. Baldwin allegedly used his relationship with Lockton to sell the AIMCO Program to Lockton's clients, which included multi-family housing owners and operators who were unaffiliated

15

with AIMCO.  *Id.* ¶ 23.  The AIMCO Program was structured such that Baldwin and Lockton would review and check the policies, issue insurance binders, and perform other administrative tasks.  *Id.* ¶ 27.  Baldwin and Lockton collected a hefty commission for every company that entered the Program.  *Id.* ¶ 28.  Baldwin and Swain & Baldwin (the "Baldwin Defendants") are allegedly "liable to the Lockton clients for, among other things, the misrepresentations to Lockton's Clients, for the Lockton Clients' lack of insurance, for higher deductibles, and for the amount of uninsured losses sustained as a result of the purchase of non-conforming policies on behalf of the Lockton Clients."  *Id.* ¶ 33.

As a result of problems with the AIMCO Program, the insurance policy, which had been obtained from Security Insurance Company of Hartford ("SICH"), was cancelled, and a new, similar policy was obtained from National Union.  *Id.* ¶¶ 34-35. Disputes arose as to that policy as well, and it was eventually cancelled.  *Id.* ¶¶ 36-37. AIMCO, Baldwin, and Lockton allegedly conspired to shift the risk of loss under the AIMCO Program by requiring Gruppuso and his company to enter into indemnity agreements with Lockton and the Lockton Clients (including AIMCO), and, knowing that Gruppuso could not pay under the agreements, requiring them to obtain surety bonds to guarantee payment.  *Id.* ¶ 40.  As a result of this scheme, $70 million in unauthorized Lumbermens bonds were allegedly issued to guarantee the indemnity agreements, and the Baldwin Defendants were able to pawn off their obligations onto Lumbermens, which to date has paid over $6 million on bonds relating to the scheme.  *Id.* ¶¶ 50-51, 53.  In addition, an unauthorized Lumbermens bond had been issued to secure a financing agreement that was used to purchase the initial SICH policy.  *Id.* ¶¶ 58-59.

16

Nutmeg again argues that all of the allegations in the Lumbermens Complaint relate to AIMCO's conduct in attempting to procure its own insurance at rates beneficial to AIMCO, which involves AIMCO's internal business operations, not its provision of "Professional Services" to others for a fee.  Def.'s Resp. at 7.  This argument, however, ignores the allegations that Baldwin acted on AIMCO's behalf with respect to the AIMCO Program and that Baldwin, who performed administrative tasks relating to the AIMCO Program, profited by receiving commissions from unaffiliated insureds participating in the AIMCO Program.  Ex. 7 to Pl.'s Br., ¶¶ 15, 27-28.  Thus, if Baldwin was acting on AIMCO's behalf in administering the AIMCO Program to the Lockton Clients, as alleged, AIMCO arguably was rendering services as an insurance administrator for others for a fee, and its actions in connection therewith can constitute a "Wrongful Act" under the Policies.  Accordingly, under *Hecla* Nutmeg owed AIMCO a duty to defend it in the Lumbermens litigation, and AIMCO is entitled to partial summary judgment on this claim.

### 4.    The Highlands Complaint

The Highlands Complaint involves the same premium financing agreement at issue in the Cananwill litigation.  Under the terms of the PFA, Cananwill agreed to finance a purported $10 million obligation AIMCO owed to National Union.  Ex. 9 to Pl.'s Br. ¶ 9.  Highlands issued two payment bonds to secure a portion of AIMCO's obligations under the PFA.  *Id.* ¶ 11.  The bonds were subsequently replaced by a different guarantor, and when AIMCO defaulted under the PFA, Cananwill sought recovery under both the bonds issued by Highlands and the replacement bonds.  *Id.* ¶¶ 12, 14.  In addition to a claim against AIMCO for indemnification, the Highlands

Complaint alleges that the $10 million loan for which the bonds were issued was not, as AIMCO and Cananwill represented, for additional policy premiums; rather, the loan was for settlement proceeds to resolve a coverage dispute between AIMCO and National Union.  *Id.* ¶¶ 30-31.

The Highlands Complaint does not support the existence of a duty to defend. The allegations are that a PFA was issued to finance an obligation owed *by AIMCO* to National Union, but that AIMCO instead used the money for settlement proceeds to resolve a coverage dispute *between AIMCO and National Union.*  Ex. 9 to Pl.'s Br., ¶¶ 9, 31.  There is no indication that any other entities were involved.  Accordingly, the allegations unequivocally support Nutmeg's assertion that the complaint describes AIMCO's conduct in improperly procuring its own insurance, loans, and security bonds. Because the alleged actions are not even arguably covered by the Nutmeg Policies, under *Hecla* Nutmeg did not owe AIMCO a duty to defend it in the Highlands litigation, and AIMCO is not entitled to partial summary judgment on this claim.

### 5.    The Basic Capital Complaint

Plaintiffs in the Basic Capital litigation alleged that they utilized the services of Defendants Swain & Baldwin and National Program Services, Inc. ("NPS") to assist them in procuring insurance on certain properties which they owned or controlled.  Ex. 9 to Pl.'s Br., ¶ 3.01.  Pursuant to defendants' agreement, plaintiffs were to receive a policy of insurance providing certain specified limits.  *Id.*  Unbeknownst to plaintiffs, Swain & Baldwin and NPS caused them to be joined on a group policy with AIMCO that was far below the limits for which they had contracted.  *Id.* ¶¶ 3.03, 3.04.  Plaintiffs alleged that the defendants breached their contract and agreement with the plaintiffs by

18

failing to provide the insurance for which the plaintiffs contracted.  *Id.* ¶ 4.02.  Plaintiffs

also alleged that the defendants were acting in concert with one another, utilizing

premiums paid by plaintiffs to procure the group policy.  *Id.* ¶ 4.05.  In addition, the

defendants allegedly misrepresented the terms and conditions of the policies, failed to

disclose the existence of a group policy, and willfully concealed material facts from the

plaintiffs.  *Id.* ¶ 4.06.

Nutmeg has failed to meet its difficult burden under *Hecla* of showing that it had

no duty to defend AIMCO in the Basic Capital litigation.  Although the complaint

specifically alleges that Swain & Baldwin and NPS (but not AIMCO) were retained to

procure insurance for the plaintiffs, it also alleges more generally that all the defendants,

which includes AIMCO, breached their contract to provide the insurance for which the

plaintiffs contracted and misrepresented the terms of the policies.  Ex. 9 to Pl.'s Br., ¶¶

3.01, 4.02, 4.06.  Thus, the implication is that AIMCO also owed the plaintiffs a

contractual duty to procure their insurance in accordance with its terms.  Accordingly,

this complaint does more than just describe AIMCO's improper conduct in acquiring its

own insurance policy, as Nutmeg alleges.  Def.'s Resp. at 9.  Rather, the complaint

arguably states a claim that AIMCO engaged in a "Wrongful Act" in the provision of

"Professional Services"; thus, the claim may fall within the coverage of the Policies.

Under *Hecla*, that is enough.  AIMCO is entitled to partial summary judgment on this

claim as to Nutmeg's duty to defend.

### 6.    The First Capital Counterclaims

According to the First Capital Counterclaims, AIMCO is a publicly held real estate

investment trust that owns and manages multi-family housing units nationwide.  Ex. 11

19

to Pl.'s Br., ¶ 18.  As a result of this, securing and maintaining property insurance is

critical to AIMCO's operations.  *Id.*  AIMCO retained the services of Ray Baldwin and

Baldwin & Swain (the "Baldwin Defendants") to negotiate and procure its insurance

contracts.  *Id.* ¶ 20.  Baldwin had authority to procure insurance for AIMCO and to

execute insurance-related documents such as premium financing agreements.  *Id.*  First

Capital was an insurance broker involved in negotiating and procuring AIMCO's

insurance coverage.  *Id.* ¶ 26.  AIMCO, the Baldwin Defendants, and others

collaborated on the AIMCO insurance program (the "AIMCO Program") that has now

been described in several of the underlying complaints, whereby a group property

insurance policy was obtained, unaffiliated insureds were illegally added, and AIMCO's

insurance premiums were lowered.  *Id.* ¶ 29.  First Capital was retained to help obtain

insurance coverage for the AIMCO Program and, in doing so, First Capital allegedly

relied on the loss data provided by AIMCO, the Baldwin Defendants, and others, which

it transmitted to prospective insurance carriers.  *Id.* ¶¶ 30-36.  Security of Hartford

eventually insured the AIMCO Program, and AIMCO, the Baldwin Defendants and

others allegedly fraudulently or negligently negotiated and executed premium financing

agreements for the policy, the funds of which were not actually paid to Security of

Hartford.  *Id.* ¶¶ 38-39.

Security of Hartford bound coverage for AIMCO "owned" (as opposed to AIMCO

"managed" or "consulted") properties under the policy, and the coverage was reflected

on the policy certificate.  *Id.* ¶ 43.  When disputes arose over payment of premiums,

First Capital began looking for a new carrier for the AIMCO Program, again relying on

and forwarding information that originated with AIMCO, the Baldwin Defendants, and

others. *Id.* ¶¶ 44, 46-47, 63.  AIG, through its affiliate National Union, issued a policy for

the AIMCO Program. *Id.* ¶ 67.  AIG and National Union then accused AIMCO and First

Capital of providing inaccurate loss information and agreed not to cancel the policy in

exchange for an additional $10 million premium, which AIMCO purportedly financed

through Cananwill. *Id.* ¶ 70-72.  Coverage for the second year was eventually canceled

for non-payment of premium. *Id.* ¶ 79.  First Capital brought counterclaims against

AIMCO and the Baldwin Defendants for negligent misrepresentation in their provision of

financial information related to procurement of insurance, negligence, and conversion.

Nutmeg has satisfied its burden under *Hecla* of showing that the allegations in

the counterclaim do not state a covered claim.  Again, the issue is whether there are

allegations of wrongful acts by AIMCO in connection with its provision of professional

services to others for a fee.  To the extent the counterclaims solely involve AIMCO's

acts with respect to obtaining property insurance for its own properties, those acts

cannot have been related to services provided for "others."  In some of the other

complaints at issue in this coverage dispute—for example, the WestRM and Basic

Capital Complaints—it is unclear whether AIMCO's actions allegedly occurred solely in

the context of procuring insurance for properties it owned as opposed to merely

managed.  Under *Hecla*, that lack of clarity resulted in Nutmeg's owing AIMCO a duty to

defend it in those lawsuits.

In this litigation, however, paragraph 43 of the First Capital counterclaim states:

"On February 29, 2000, Security Insurance Company of Hartford bound coverage for

AIMCO "owned" (as opposed to AIMCO "managed" or "consulted") properties under the

Security of Hartford Policy.  The coverage was bound based on information forwarded

by First Capital that had been provided and generated by AIMCO, the Baldwin Defendants, Gruppuso, NPS, or Lockton on AIMCO's behalf.  Policy Certificate FCG 001039 reflected the coverage."  Ex. 11 to Pl.'s Br., ¶ 43.  There is no indication in the counterclaim that the scope of the bound coverage ever changed.  The acts about which First Capital complains were clearly based on AIMCO's procurement of insurance for properties that it owned, and they cannot have been related to services AIMCO provided to "others."  Accordingly, as a matter of law Nutmeg owes AIMCO no duty to defend it in the First Capital litigation, and AIMCO is not entitled to partial summary judgment on this claim.

### 7.    The National Union Counterclaim

The National Union Counterclaim, like the First Capital Counterclaims, involves allegations that AIMCO obtained a policy of property insurance at a low cost because of its misrepresentations regarding the relationship of the other covered entities to AIMCO as well as the total insured value of the covered properties and the historical loss data. Ex. 15 to Pl.'s Br., at 2.  National Union agreed to provide a $1,000,000 primary property policy for AIMCO.  *Id.* ¶ 24.  In issuing the policy, National Union relied on AIMCO's false representation, among others, that each of the 51 entities that sought property insurance from National Union was related to AIMCO.  *Id.* ¶ 26.  After concerns arose about the policy's loss ratio, AIMCO agreed to pay an additional premium, and National Union agreed to provide increased wind coverages for all 51 entities.  *Id.* ¶ 38. After many negotiations about renewal of the policy, AIMCO chose not to renew it.  *Id.* ¶ 57.

The crux of these allegations is that AIMCO obtained an insurance policy for itself and 51 other entities that ultimately turned out to be unaffiliated with AIMCO. Although there is no specific allegation that they obtained a fee from any of the other entities, it is certainly implied given AIMCO's business as both a property owner and manager. Thus, although unclear, the allegations at least arguably state a claim based on AIMCO's "Wrongful Acts" in the provision of "Professional Services." Under *Hecla*, Nutmeg owed AIMCO a duty to defend it in the National Union litigation, and AIMCO is entitled to partial summary judgment on this claim as to Nutmeg's duty to defend.

## V.      RECOMMENDATION

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that Plaintiff AIMCO's Motion for Partial Summary Judgment on Breach of the Duty to Defend (Docket No. 31) be **GRANTED IN PART and DENIED IN PART** as set forth below. It is recommended that plaintiff's motion be **GRANTED** with respect to the WestRM Complaint, the Lumbermens Complaint, the Basic Capital Complaint, and the National Union Counterclaim. It is further recommended that plaintiff's motion be **DENIED** with respect to the Cananwill Complaint, the Highlands Complaint, and the First Capital Counterclaim, and that these claims be dismissed.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge,**

23

**Fed. R. Civ. P. 72(b), <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Done this 9th day of April 2007.

BY THE COURT:


<u>s/ Michael J. Watanabe</u>
MICHAEL J. WATANABE
United States Magistrate Judge