IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 06-cv-00508-WDM-MJW

APARTMENT INVESTMENT AND MANAGEMENT COMPANY (AIMCO),

     Plaintiff,

v.

NUTMEG INSURANCE COMPANY,

     Defendant.

---

## ORDER ON PENDING MOTIONS

---

     This insurance coverage dispute is before the Court on several motions filed by both parties. On April 9, 2007, the Magistrate Judge issued a Recommendation (Dkt. # 77) that Plaintiff's Motion for Partial Summary Judgment on Breach of the Duty to Defend (Dkt. # 31), filed on September 21, 2006, be granted in part and denied in part. Plaintiff and Defendant each timely filed objections to the Recommendation (Dkt. ## 83, 86). Also pending is Defendant's Motion for Summary Judgment (Dkt. # 101), filed on May 24, 2007. The motions are fully briefed and ripe for disposition. After a review of the pleadings and the parties' written arguments, I conclude oral argument is not required. For the reasons that follow, summary judgment shall enter in favor of Defendant and against Plaintiff.

## I.    BACKGROUND

     Apartment Investment and Management Company ("AIMCO"), the plaintiff in this insurance coverage dispute, is a self-administered and self-managed real estate

insurance trust ("REIT") engaged in the acquisition, ownership, management, and redevelopment of apartment properties. Pl.'s S.J. Br. (Dkt. # 32), Ex. 1 ¶ 3.[1] Defendant Nutmeg Insurance Company ("Nutmeg") issued two professional liability insurance policies to AIMCO—Miscellaneous Professional Liability Policy Nos. NPG0150962 (the "NPG Policy") and 00PG0150962 (the "OOPG Policy") (collectively, the "Policies")—that are the subject of this case.[2] AIMCO's claims arise out of Nutmeg's denial of coverage under the Policies with regard to the following seven lawsuits, involving claims by third parties against AIMCO, that were tendered to Nutmeg for defense and indemnity:

- *WestRM–West Risk Markets, Ltd. v. Lumbermens Mut. Cas. Co., et al.* ("*WestRM*"), filed in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 7244. Ex. 6.

- *Cananwill, Inc. v. AIMCO, et al.* ("*Cananwill*"), filed in the Superior Court of New Jersey, Morris County, Civil Action No. MRSL-3549-02. Ex. 5.

- *Highlands Ins. Co. v. Cananwill, Inc., et al.* ("*Highlands*"), filed in the Superior Court of New Jersey Law Division, Morris County, Civil Action No. MRSL-1874-03, consolidated with Civil Action No. MRSL-3549-02. Ex. 9.

- *Lumbermens Mut. Cas. Co. & Universal Bonding Ins. Co. v. AIMCO, et al.* ("*Lumbermens*"), filed in the United States District Court for the Southern District of New York, Civil Action No. 02 Civ. 9704. Ex. 7.

- *Basic Capital Mgmt., Inc. & Transcontinental Realty Investors, Inc. v. AIMCO, et al.* ("*Basic Capital*"), filed in the 68th Judicial District of Texas, Dallas County, Civil Action No. 03-9530. Ex. 11.

---

[1] Unless otherwise noted, all cited exhibits are those attached to AIMCO's brief in support of its motion for partial summary judgment.

[2] As is relevant to this case, the NPG Policy took effect on November 20, 2000 and extended to November 20, 2002. Ex. 3. The OOPG Policy took effect on November 20, 2002, and extended until September 1, 2003. Ex. 4. Nutmeg has also filed a motion for partial summary judgment [Dkt. # 143], seeking dismissal of all claims based on alleged coverage under the NPG Policy. For simplicity, and because Nutmeg disputes the applicability of the NPG Policy, the Court will cite only to the OOPG Policy unless there are relevant substantive differences between the policies.

- *AIMCO v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., et al.* ("*First Capital*"), filed in the United States District Court for the District of Colorado, Civil Action No. 01-M-2018. Ex. 13.
- *AIMCO v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., et al.* ("*National Union*"), filed in the United States District Court for the District of Colorado, Civil Action No. 01-M-2018. Ex. 15.[3]

Nutmeg denied coverage under the Policies on all seven claims. Exs. 8, 10, 12, 14, 16.

On February 28, 2006, AIMCO filed a complaint against Nutmeg in Denver County District Court, bringing causes of action for: (1) a declaratory judgment that Nutmeg was obligated to defend and indemnify AIMCO in the lawsuits; (2) breach of contract; (3) willful breach of contract; and (4) bad faith breach of insurance contract. The case was properly removed to federal court under 28 U.S.C. § 1441 on diversity grounds.

AIMCO moved for partial summary judgment on the issue of whether Nutmeg had a duty to defend AIMCO in each of the underlying suits. The Magistrate Judge recommended that the motion be granted in part and denied in part, concluding that Nutmeg owed AIMCO a duty of defense in *WestRM*, *Lumbermens*, *Basic Capital*, and *National Union*, but that AIMCO owed no duty to defend AIMCO in *Cananwill*, *Highlands*, and *First Capital*. The parties each filed objections to the portions of the Recommendation that were unfavorable to them. In the meantime, Nutmeg filed a cross motion for summary judgment seeking dismissal of all claims. The motion is based largely on the same issues and arguments discussed in the briefing on AIMCO's motion for partial summary judgment and the parties' objections to the Magistrate

---

[3] The First Capital and National Union suits are the same action, but they involve claims against AIMCO by two different counterclaim defendants.

Judge's Recommendation on that motion, as the parties again dispute whether Nutmeg owes AIMCO a duty to defend it in the underlying lawsuits.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  F.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  When applying this standard, I review the pleadings and the documentary evidence in the light most favorable to the nonmoving party.  *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).

With respect to the Recommendation of the Magistrate Judge, I review *de novo* those portions of the Recommendation "to which specific written objection has been made."  28 U.S.C. § 636(b)(1); F.R.Civ.P. 72(b).

## III.    POLICY INTERPRETATION

### A.    Applicable Law

Under Colorado law,[4] the interpretation of insurance contracts is a question of law for the court.  *Am. Standard Ins. Co. v. Savaiano*, 298 F. Supp. 2d 1092, 1094 (D. Colo. 2003) (citing *Peterman v. State Farm Mut. Auto. Ins. Co.*, 8 P.3d 549 (Colo. App. 2000)).  Insurance policies are interpreted in accordance with general principles of contract interpretation and accordingly must be construed to ascertain and effectuate the mutual intent of the parties.  *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 502 (Colo. 2004); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984).  An unambiguous contract should thus be enforced according to the plain and

---

[4] There is no dispute that Colorado substantive law applies to the claims at issue.

4

generally accepted meaning of its language. *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 256, 577 P.2d 748, 750 (Colo. 1978). Ambiguous language must be construed in favor of the insured and against the insurer who drafted the policy. *Thompson,* 84 P.3d at 502. Generally, coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage. *Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1327 (Colo. App. 1994).

**B.    Relevant Policy Provisions**

The relevant portions of the Policies[5] are as follows:

**I.    INSURING AGREEMENT**

This Policy affords the following coverage:

The Company [Nutmeg] will pay on behalf of the **Insured** all sums in excess of the Deductible amount stated in the Declarations which the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** resulting from **Claims** first made against the **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, as a result of a **Wrongful Act** by the **Insured** or any **Entity** for whom the **Insured** is legally liable, provided that such **Wrongful Act** was committed on or after the **Retroactive Date** and before the end of the **Policy Period**.
. . . .

**III.    TERRITORY, DEFENSE, CONSENT AND SETTLEMENT**
. . . .

The Company has the sole right to appoint defense counsel and the right and duty to defend any **Claim** made against the **Insured**.
. . . .

---

[5]Citations are to the OOPG Policy.

## V.    DEFINITIONS

1.    **"Claim"** means receipt by the **Insured** of a written demand naming the **Insured** seeking **Damages**, **Professional Services**, or **Equitable Relief** arising out of a **Wrongful Act** by the **Insured** or any **Entity** for whom the **Insured** is legally liable.

A **Claim** is considered first made when the **Insured** receives notice of **Claim** from a claimant or such claimant's legal representative, or when deemed to be made pursuant to Condition (A) and/or Condition (B) of this Policy.

2.    **"Claims Expenses"** means (a) reasonable and necessary fees charged by an attorney(s) designated by the Company to defend a **Claim**, and (b) all other fees, costs and charges resulting from the investigation, adjustment, defense, and appeal of a **Claim**, if incurred by the Company. . . .

3.    **"Damages"** means a compensatory monetary amount for which the **Insured** may be held legally liable, including judgments (inclusive of any pre- or post-judgment interest), awards, or settlements negotiated with the approval of the Company. . . .

. . . .

7.    **"Equitable Relief"** means a remedy not involving the payment of monetary damages.

. . . .

9.    **"Insured"** means only the following:

(a)    The Named Insured designated in Item 1 of the Declarations [AIMCO] or by endorsement to this Policy;

(b)    Any person who is, was, or hereafter becomes a partner, principal, officer, director, member, or employee of the Named Insured, but only while acting on behalf of the Named Insured;

. . . .

(e)    Any **Subsidiary**.

. . . .

6

14. **"Professional Services"** means those services set forth in Item 7 of the Declarations requiring special learning or intellectual skill, performed by the **Insured** in the ordinary conduct of its profession for others for a fee, remuneration or other consideration; or as otherwise defined by endorsement to this Policy.

. . . .

16. **"Subsidiary"** means any entity identified in the application for this Policy in which at the time of its **Wrongful Act**, the Named Insured had an ownership interest of greater than 50%. . . . .

17. **"Wrongful Act"** means any actual or alleged act, error or omission in the rendering of or failure to render **Professional Services**.

Ex. 4 at AIMCO-PL0571–PL0574.

Endorsement 6 to the Policy amends the definition of "Insured" to also include:

(f) any independent contractor, but only for **Claims** arising from **Wrongful Acts** which were rendered, or which should have been rendered, by or for the Named Insured named in ITEM 1 of the DECLARATIONS [AIMCO], and otherwise covered by this Policy.

*Id.* at AIMCO-PL0587. ITEM 7 of the Declarations, which sets forth the particular

services included in the definition of "Professional Services," states:

**ITEM 7.** PROFESSIONAL SERVICES:
Solely in the performance of providing professional services as a real estate agent/broker, property manager, asset manager, loan services and administrator [sic], risk manager, insurance administrator, real estate investment advisor, tax fund management [sic] for others for a fee.

*Id.* at AIMCO-PL0570 (original in all caps).

Finally, the Policies in pertinent part exclude from coverage claims "for, based

upon, or arising from the performance of or failure to perform services as an insurance

agent [or] insurance broker." *Id.* at AIMCO-PL0015, PL0585. In addition, the OOPG

Policy, but not the NPG Policy, excludes from coverage claims "for, based upon, or arising from the failure to effect or maintain any insurance or bond." *Id.* at AIMCO-PL0585.

### C. Interpretation Dispute

In their briefing on AIMCO's motion for partial summary judgment, the parties dispute the proper interpretation of the policy term "Professional Services." Nutmeg contends that the term only includes services provided "for others for a fee." Def.'s Resp. (Dkt. # 59) at 16 (quoting Policies, Item 7 & Def. of "Professional Services"). AIMCO contends that (1) as a result of Endorsement 6, the term "others" in the definition of "Professional Services" can include AIMCO when the services are provided for AIMCO by an independent contractor, and (2) Endorsement 6 modifies the term "Professional Services" to wholly eliminate the requirement that the enumerated services be provided "for others for a fee, remuneration or other consideration." Pl.'s Reply (Dkt. #60) at 9–10, 14–15.

The Magistrate Judge agreed with Nutmeg's interpretation, concluding that the term "others" does not include AIMCO or any insured under the Policies and that Endorsement 6 does not modify the definition of the term "Professional Services." Rec. at 9–10. AIMCO argues the Magistrate Judge's interpretation is erroneous. In light of AIMCO's specific objection, I have reviewed the Magistrate Judge's policy interpretation *de novo*. Upon such *de novo* review, I am in full agreement with this portion of the Magistrate Judge's Recommendation, which is reproduced below with minimal modification and expansion.

### 1.  *The Term "Others" in the Definition of "Professional Services"*

The term "Professional Services" is defined in the OOPG Policy in pertinent part as "those services set forth in Item 7 . . . requiring special learning or intellectual skill, performed by the **Insured** in the ordinary conduct of its profession for others for a fee, remuneration or other consideration."  Ex. 4 § V(14).  In turn, Item 7 limits the term to services "[s]olely in the performance of providing professional services as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager, insurance administrator, real estate investment advisor for others for a fee." *Id.* at AIMCO-PL0570.  Included in the definition of "Insured," as modified by Endorsement 6, are AIMCO, AIMCO's officers and employees acting on its behalf, AIMCO's subsidiaries, and independent contractors with respect to claims based on "Wrongful Acts" relating to services that were rendered, or that should have been rendered, by or for AIMCO.  *Id.* § V(9) & AIMCO-PL0587.

As the Magistrate Judge concluded, AIMCO may not, as it contends, be considered an "other" under any circumstances for purposes of the coverage grant. Construing the policy terms together, it is clear that "Professional Services" generally include those performed by AIMCO and its officers, employees, subsidiaries, and independent contractors for others for a fee.  Such services do not, however, include services performed by one Insured to another Insured.  To the extent an independent contractor performs qualified services *on AIMCO's behalf* for others for a fee, they would of course qualify based on the inclusion of independent contractors in the definition of "Insured."  However, an interpretation of the term "other" to include AIMCO, or any other Insured, is simply unreasonable.

9

## 2. *Effect of Endorsement 6*

Again, Endorsement 6 amends the term "Insured" to include "any independent contractor, but only for **Claims** arising from **Wrongful Acts** which were rendered, or which should have been rendered, by or for the Named Insured named in ITEM 1 of the DECLARATIONS [*i.e.* AIMCO], and otherwise covered by this Policy." Ex. 4 at AIMCO-PL0587. AIMCO claims this endorsement modifies the term "Professional Services" to mean "those services set forth in Item 7 of the Declarations requiring special learning or intellectual skill, rendered by or for the **Named Insured** named in ITEM 1 of the Declarations." Pl.'s Br. at 14–15 (emphasis omitted). That is, because Endorsement 6 does not include the requirement that the services have been rendered "for others for a fee," AIMCO asserts the endorsement modifies the definition of "Professional Services" to omit such a requirement. *See* Pl.'s Obj. at 17.

I fail to follow AIMCO's logic. Taking into consideration the definition of "Wrongful Acts," Endorsement 6 simply amends the definition of "Insured" to include independent contractors with respect to errors or omissions in rendering or failing to render "Professional Services" by or for AIMCO. Ex. 4 at AIMCO-PL0587. As stated by the Magistrate Judge, Endorsement 6 does not purport to modify the definition of "Professional Services," nor does it do so except to the extent independent contractors may now render such services as an "Insured." Thus, I hold that the definition of "Professional Services" continues to include the requirement that the services be rendered "for others for a fee, remuneration or other consideration."

## IV.   ANALYSIS OF DUTY TO DEFEND

### A.   Applicable Law on Insurer's Duty to Defend

An insurer's duty to defend its insured is distinct from, and broader than, its duty to indemnify. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 & n.5 (Colo. 1991). The duty to defend arises when the underlying complaint against the insured "alleges any facts that might fall within the coverage of the policy." *Id.* at 1089. Thus, the duty is triggered when the "allegations in the complaint, . . . if sustained, would impose a liability covered by the policy." *Id.* To establish the duty to defend, "the insured need only show that the underlying claim may fall within policy coverage," while to avoid the duty "the insurer must prove [the claim] cannot" be covered. *Id.*

Whether an insurer has a duty to defend a particular claim is a question of law. *Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999). In evaluating whether a duty to defend exists, the court compares the allegations in the complaint with the terms of the insurance contract. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).[6] If the allegations "state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded," then the insurer owes a duty to defend its insured against the underlying claim. *Hecla*, 811 P.2d at 1089.

---

[6] Citing case law from other jurisdictions, AIMCO argues that, in evaluating whether an insurer owes a duty to defend, courts should also take into account extrinsic facts of which the insurer is aware that raise a potential for coverage. Pl.'s Resp. (Dkt. # 115) at 23. However, Colorado law is clear that an insurer's duty to defend is based on "the face of the complaint." *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo. 2004); *see also Miller v. Hartford Cas. Ins. Co.*, 160 P.3d 408, 410 (Colo. App. 2007) ("When determining whether a duty to defend exists, a trial court *must* restrict its examination to the four corners of the complaint.") (emphasis added). Thus, while I have doubts that consideration of extrinsic evidence would affect my conclusion, I in any event will not consider such evidence in evaluating whether Nutmeg owed AIMCO a duty to defend it in the underlying suits.

## B. Allegations in the Underlying Complaints

The parties agree that all seven underlying suits "arise from a common core of operative facts." Pl.'s S.J. Resp. (Dkt. # 115) at 2; *see* Def.'s S.J. Br. at 2. Thus, I will summarize the allegations in each complaint and then compare the allegations with the Policies' provisions. I begin with the *WestRM* complaint, as it provides the most detailed background of the scheme in which AIMCO allegedly participated that gave rise to these lawsuits.

### 1. *WestRM*

In the *WestRM* Complaint, Greenwich Insurance Company ("Greenwich") and XL Reinsurance America Inc. ("XL"), the guarantors of certain financing agreements, alleged that AIMCO participated in a scheme to benefit itself through fraudulently obtaining premium financing secured by surety bonds. Ex. 6 (Part 2) ¶¶ 4-5. The relevant participants in this scheme included: AIMCO; licensed insurance broker Ray Baldwin and his company, Swain & Baldwin Insurance Co., Inc. ("S&B"), who were appointed as AIMCO's insurance and risk management department (collectively the "Baldwin Defendants"); Vito Gruppuso, an insurance agent who has pleaded guilty to several felonies; and NPS, Gruppuso's insurance brokerage company. *Id.* ¶¶ 2, 3, 16, 17, 26, 27. AIMCO allegedly used the funds it obtained to fuel a Ponzi scheme rather than pay the insurance premiums for which it ostensibly needed financing. *Id.* ¶ 5.

The complaint asserts that AIMCO is a publicly traded owner and operator of apartment homes. *Id.* ¶ 33. Keeping its insurance down and managing the risks and losses associated with property ownership and management is of critical importance to AIMCO's business. *Id.* ¶ 34. AIMCO authorized Baldwin to create, implement and

manage a coordinated insurance and risk management program. *Id.* ¶ 38. Baldwin collaborated with Gruppuso and NPS on AIMCO's behalf to design and develop a multi-family real estate insurance program for AIMCO "and others." *Id.* ¶ 49. The scheme began when Baldwin, Gruppuso, and NPS procured a three-year property casualty insurance policy from Security Insurance Company of Hartford ("Hartford") with AIMCO and its affiliates listed as the "Named Insureds." *Id.* ¶ 50–51. They allegedly added insureds to the policy that had no relationship to AIMCO, and collected premiums from them, in violation of the terms of the policy and applicable law. *Id.* ¶ 52. As a result, the Baldwin Defendants, NPS, and Gruppuso received commissions from the added insureds, and AIMCO reduced the cost of its own insurance, which was effectively subsidized by the unaffiliated insureds who were paying higher rates than AIMCO. *Id.* ¶ 53.

To purchase the policy, AIMCO procured premium financing from AFCO Credit Corporation ("AFCO") through a premium financing agreement ("PFA"). *Id.* ¶ 55. Baldwin and Gruppuso obtained additional financing by falsely representing to financial institutions that the lines of credit would be secured by PFAs to which AIMCO was a party, when in reality the PFAs they had presented were phony documents referencing companies that did not exist. *Id.* ¶¶ 58–68. AIMCO canceled the Hartford policy shortly after its inception when "irregularities in the purported scope of coverage came to light as the unaffiliated insureds began suffering losses." *Id.* ¶¶ 69-70. In addition, none of the unearned premiums that were returned upon cancellation were paid to AFCO or the unaffiliated insureds, but instead were used to fund the Ponzi scheme. *Id.* ¶¶ 71–74.

After the Hartford policy was canceled, AIMCO and Gruppuso continued the scheme by purchasing a new insurance policy from National Union Fire Insurance Company of Pittsburgh ("National Union") and obtaining premium financing from Cananwill, Inc. *Id.* ¶ 76. The named insured on the policy was "Apartment Investment Management Co./Real Estate Management LLC," which was a phony entity used to fuel the ongoing scheme. *Id.* ¶¶ 77–78. The same entity was identified as the "insured-borrower" on the PFA with Cananwill. *Id.* ¶ 80. Again, entities unaffiliated with AIMCO were fraudulently added as insureds, AIMCO's rates were accordingly lowered, and phony financing documents, which misrepresented that the unaffiliated insureds were AIMCO entities without their knowledge, were used to continue raising funds for the scheme. *Id.* ¶¶ 82–84. Subsequently, in connection with a dispute between AIMCO and National Union, AIMCO executed a second PFA with Cananwill (with the same phony entity named as the insured party) to fund a $10 million "fully earned" premium National Union demanded in lieu of canceling the policy. *Id.* ¶¶ 87–90. The second Cananwill PFA was secured by two bonds Baldwin and Gruppuso obtained from Highlands Insurance Company ("Highlands"). *Id.* ¶ 91. AIMCO subsequently failed to repay the amounts owed to Cananwill under the PFAs as they became due, and the National Union policy was eventually canceled. *Id.* ¶¶ 102, 105.

In addition, to protect itself from potential liability, AIMCO entered into two indemnity agreements with NPS and Gruppuso for losses it could incur with respect to the above-described transactions. *Id.* ¶¶ 95, 134. Knowing that NPS and Gruppuso could not honor such agreements, AIMCO demanded surety bonds to shift the losses to a surety company. *Id.* ¶¶ 98, 131. Gruppuso obtained such bonds from Lumbermens

Mutual Casualty Company ("Lumbermens") through Robert Nicosia, a Lumbermens agent who was associated with Gruppuso. *Id.* ¶ 99.

NPS thereafter engaged in a scheme involving "loans disguised as insurance transactions" to raise additional funds to cover its growing obligations. *Id.* ¶¶ 139–40. NPS obtained insurance policies to cover its pre-existing losses; the policies were funded by WestRM Risk Markets Ltd. ("WestRM") under two PFAs (one executed by NPS and the other executed by both NPS and AIMCO) that were secured by Lumbermens bonds as well as Greenwich/XL bonds. *Id.* ¶¶ 144, 147, 156–59, 166, 171. Gruppuso used part of the proceeds from these transactions to satisfy his obligations under the indemnity agreements with AIMCO. *Id.* ¶ 179.

The scheme eventually collapsed, and several lawsuits ensued. *Id.* ¶ 181. NPS defaulted on the first WestRM PFA, and NPS and AIMCO defaulted on the second WestRM PFA. *Id.* ¶¶ 185, 189. Accordingly, WestRM demanded payment from Greenwich and XL for both PFAs under the bonds. *Id.* ¶¶ 186–91. WestRM brought the underlying suit and obtained summary judgment for approximately $26 million against Greenwich and XL based on amounts AIMCO and NPS had refused to pay under the WestRM PFAs. *Id.* ¶¶ 192–95. Greenwich and XL in turn filed several third-party claims, including claims against AIMCO for fraud, civil conspiracy, aiding and abetting fraud, negligent supervision, indemnification, unjust enrichment, and subrogation of WestRM's breach of contract and fraudulent inducement claims.

The claims were based essentially on the defendants' alleged scheme to defraud insurance companies, insured parties "for whom [defendants] obtained insurance," financing companies, and surety companies. *Id.* ¶ 223. This scheme included Baldwin

and AIMCO's alleged misrepresentations and concealment regarding the transactions underlying the second WestRM PFA, such as: (1) their failure to disclose the "series of schemes involving the AIMCO insurance program," including their misrepresentations to Hartford and National Union regarding the unaffiliated insureds added to the policies, their misrepresentation of the scope of coverage to the additional insureds, and the fact that AIMCO benefited by obtaining coverage at below-market premiums; (2) their failure to disclose the fact that AIMCO entered into the indemnity agreements with Gruppuso and NPS with knowledge that they were insolvent and that their obligations would be shifted to the surety companies that secured the agreements; and (3) their failure to disclose that the WestRM PFA transactions were designed to fund NPS's obligations to AIMCO under the indemnity agreements. *Id.* ¶ 208.

### 2. *Cananwill*

The *Cananwill* complaint contains allegations against AIMCO for failure to pay the balance due under a secured PFA (the second Cananwill PFA discussed above in the *WestRM* complaint). Ex. 5 ¶ 1. The complaint alleges Cananwill entered into a PFA with AIMCO whereby Cananwill financed AIMCO's insurance premiums owed to National Union. *Id.* ¶¶ 32–33. Cananwill subsequently entered into a second PFA with AIMCO (negotiated and executed on AIMCO's behalf by Baldwin and Gruppuso) whereby Cananwill loaned AIMCO $10 million for payment of additional premiums. *Id.* ¶¶ 39–41, 44. The Insured on the policy was identified in the second PFA as "Apartment Investment Mgmt. Co/Real Estate Risk Mgmt LLC." *Id.* ¶ 46(a).

At Cananwill's insistence, AIMCO obtained a guaranty bond from Highlands to secure AIMCO's obligations under the second PFA. *Id.* ¶ 67–68. The Highlands bond

was subsequently replaced with bonds issued by Greenwich and XL. *Id.* ¶¶ 69–72.
When AIMCO defaulted on its payments under the second PFA, Cananwill sought
recovery under the Greenwich/XL bonds and then filed the underlying complaint against
AIMCO, Greenwich, and XL. *Id.* ¶¶ 95–103. Cananwill asserted claims against AIMCO
in pertinent part for breach of contract and unjust enrichment based on failure to repay
the amounts loaned to AIMCO, and also asserted AIMCO was estopped from
contesting the validity of the second PFA.

### 3. *Highlands*

The *Highlands* complaint involves claims by the surety company that originally
issued the bonds to secure the second Cananwill PFA. Again, Cananwill agreed under
the PFA to finance AIMCO's purported $10 million obligation to pay insurance premiums
to National Union. Ex. 9 ¶ 9. Highlands issued surety bonds to secure AIMCO's
obligations under the PFA, and those bonds were subsequently replaced with bonds
issued by Greenwich and XL. *Id.* ¶¶ 11–13. AIMCO defaulted on its payments under
the PFA, and Highlands then filed the underlying complaint, which included a cause of
action against AIMCO for indemnification for any amounts Highlands owed under the
bonds. *Id.* ¶¶ 43–44. Highlands also sought rescission of the bonds based on AIMCO's
misrepresentation that the proceeds from the loan for which the bonds were issued
were for additional policy premiums, when in fact they were allegedly used for payment
of settlement proceeds to resolve a coverage dispute between AIMCO and National
Union. *Id.* ¶¶ 30–31, 38.

### 4. *Lumbermens*

The allegations in the *Lumbermens* complaint are similar to those in the *WestRM* complaint, involving AIMCO's alleged participation in an unlawful property insurance program and sham indemnity agreement scheme. *See* Ex. 7 ¶¶ 1–2. The specific allegations are as follows: In connection with AIMCO's ownership and management of properties throughout the United States, AIMCO requires general liability and property insurance, and keeping insurance costs down is of major importance to AIMCO. *Id.* ¶ 13. Baldwin set up AIMCO's risk management department and was responsible for purchasing AIMCO's insurance. *Id.* ¶ 14. Baldwin hired S&B and Lockton Companies, Inc. ("Lockton"), among others, to serve as AIMCO's insurance brokers. *Id.* ¶ 16. Baldwin collaborated with Gruppuso, an insurance agent, on the design and development of a multi-family real estate insurance program for AIMCO (the "AIMCO Program"), pursuant to which S&B and Lockton received substantial commissions and AIMCO reduced its premium costs through a scheme in which companies unaffiliated with AIMCO were added as additional insureds to AIMCO's insurance policies, contrary to the terms of the policies and in violation of law. *Id.* ¶ 19.

Baldwin allegedly used his relationship with Lockton to sell the AIMCO Program to Lockton's clients, which included multi-family housing owners and operators. *Id.* ¶ 23. However, the coverage and premiums promised to these Program participants could not be obtained in the insurance market. *Id.* ¶ 24. The AIMCO Program was structured so that Baldwin and Lockton would review and check the policies, issue insurance binders, and perform other administrative tasks. *Id.* ¶ 27. The Baldwin Defendants are allegedly "liable to the Lockton clients for, among other things, the

misrepresentations to Lockton's Clients, for the Lockton Clients' lack of insurance, for higher deductibles, and for the amount of uninsured losses sustained as a result of the purchase of non-conforming policies on behalf of the Lockton Clients." *Id.* ¶ 33.

AIMCO, the Baldwin Defendants, and Lockton then conspired to limit their exposure for the losses resulting from "their failure to obtain the insurance coverage and rates that had been promised" to Lockton's clients. *Id.* ¶ 38. They required Gruppuso and NPS to enter into indemnity agreements with Lockton and Lockton's clients (including AIMCO) for such losses, as well as a separate indemnity agreement with AIMCO to cover its other potential losses stemming from the AIMCO Program. *Id.* ¶¶ 40, 65. Knowing Gruppuso could not pay under the agreements, they required Gruppuso to obtain surety bonds to guarantee payment. *Id.* ¶¶ 40, 65. As a result of this scheme, over $70 million in unauthorized Lumbermens bonds were allegedly issued to guarantee the indemnity agreements, and Lumbermens to date has paid over $6 million on bonds relating to the scheme. *Id.* ¶¶ 50–51, 53, 66. In addition, an unauthorized Lumbermens bond was issued to secure the PFA that had financed the purchase of one of the AIMCO Program insurance policies. *Id.* ¶¶ 58–59. Finally, two more unauthorized Lumbermens bonds were issued to secure the WestRM PFAs that financed two professional liability insurance policies issued to NPS, which benefited AIMCO because of the indemnity agreement. *Id.* ¶¶ 71, 73. AIMCO and NPS—the principals on the PFAs—failed to make payments, and WestRM in turn made claims under the bonds. *Id.* ¶¶ 74–75.

Lumbermens sued AIMCO and the Baldwin Defendants on its own behalf and as successor-in-interest to the claims of the Lockton clients, bringing the following causes

of action relevant to AIMCO: (1) a declaration that the bonds securing the two indemnity agreements between AIMCO and NPS, as well as AIMCO's claims under those bonds, were invalid and unenforceable; (2) a declaration that the bond securing the PFA that financed the insurance policy was invalid and unenforceable; (3) indemnification from AIMCO, as a principal on the WestRM PFAs, for Lumbermens' losses associated with the bonds that secured those PFAs; (4) civil conspiracy to commit fraud against all defendants for transferring their potential liability under the AIMCO Program to Lumbermens; and (5) fraud against all defendants with respect to the premiums charged and coverage provided in the AIMCO Program to the Lockton clients.

### 5. *Basic Capital*

The plaintiffs in the *Basic Capital* litigation are two participants in the AIMCO program that were unaffiliated with AIMCO. They alleged that they utilized the services of S&B and NPS to assist them in procuring insurance on certain properties they owned or controlled. Ex. 11 ¶ 3.01. Pursuant to an agreement with those defendants, the plaintiffs were to receive a policy of insurance providing certain specified limits for which they paid over $2.8 million. *Id.* Unbeknownst to the plaintiffs, S&B and NPS caused them to be joined on a group policy with AIMCO that was far below the limits for which they had contracted. *Id.* ¶¶ 3.03, 3.04. They brought causes of action against AIMCO, S&B, and NPS for: (1) breach of contract for failure to provide the insurance for which plaintiffs contracted, *id.* ¶ 4.02; and (2) fraud and conspiracy to commit fraud by utilizing plaintiffs' premiums to procure a group policy for AIMCO and its affiliates and by misrepresenting the terms and conditions of the policies. *Id.* ¶¶ 4.05, 4.06.

###### 6. *First Capital*

The First Capital complaint involves counter-, cross-, and third-party claims brought by First Capital Agency, Inc. ("First Capital") in a lawsuit that was originally brought by AIMCO against First Capital and others, including National Union, Hartford, NPS, and Gruppuso. *See generally* Ex. 13. The complaint alleges AIMCO is a publicly held real estate investment trust that owns and manages multi-family housing units nationwide. *Id.* ¶ 18. As a result of this, securing and maintaining property insurance is critical to AIMCO's operations. *Id.* AIMCO retained the services of the Baldwin Defendants to negotiate and procure its insurance contracts as its authorized agent. *Id.* ¶ 20. First Capital was an insurance broker involved in negotiating and procuring AIMCO's insurance coverage. *Id.* ¶ 26.

AIMCO allegedly collaborated with the Baldwin Defendants, Gruppuso, NPS, and Lockton on the AIMCO insurance program that has been described in all the underlying complaints, whereby a group property insurance policy was obtained, unaffiliated insureds were illegally added, and AIMCO's insurance premiums were thereby lowered. *Id.* ¶ 29. Gruppuso retained a wholesale broker to obtain coverage for the AIMCO Program, and that broker in turn retained First Capital to assist it. *Id.* ¶ 30. Relying on loss data provided by AIMCO, the Baldwin Defendants, Gruppuso, NPS, and Lockton, First Capital compiled a package of information on AIMCO's insurance needs that was transmitted to prospective insurance carriers. *Id.* ¶¶ 31–35.

The AIMCO Program was eventually insured by Hartford, with whom First Capital had a non-binding agency agreement. *Id.* ¶¶ 37, 40. AIMCO, the Baldwin Defendants, Gruppuso, NPS, and Lockton allegedly fraudulently or negligently executed PFAs and

thereby collected approximately $32 million, which exceeded the actual premiums due under the Hartford policy and none of which was paid to Hartford or First Capital. *Id.* ¶¶ 38–39. First Capital continued to forward information it received on new entities seeking coverage under the AIMCO Program to Hartford and the underwriters. *Id.* ¶ 42. When disputes arose over payment of premiums, First Capital sought a new carrier for the AIMCO Program, again relying on and forwarding information that originated with AIMCO, the Baldwin Defendants, Gruppuso, NPS, or Lockton. *Id.* ¶¶ 44, 46–47. AIG, through its affiliate National Union, issued a policy for the AIMCO Program. *Id.* ¶ 60. That policy also was eventually canceled. *Id.* ¶ 79.

First Capital asserts that, to the extent any data or information concerning AIMCO was incomplete or incorrect and First Capital is found liable to any party based on its forwarding that data, the responsibility for such inaccuracies lies with AIMCO, the Baldwin Defendants, Gruppuso, NPS, and Lockton. *Id.* ¶ 82. First Capital brought claims against those defendants for negligence and negligent misrepresentation in their provision of financial information in connection with the procurement of insurance for AIMCO. First Capital also brought claims for contribution/indemnification based on the above misrepresentations and for conversion with respect to moneys fraudulently obtained and never paid to Hartford or First Capital.

### 7. *National Union*

The *National Union* complaint involves counter-, cross-, and third-party claims brought by National Union in the same underlying suit discussed in the previous section. *See generally* Ex. 15. It again involves allegations that AIMCO obtained a policy of property insurance at a low cost because of its misrepresentations regarding both the

relationship of the other covered entities to AIMCO and the total insured value of the covered properties and the historical loss data. *Id.* at 2. National Union agreed to provide a $1 million primary property policy for AIMCO. *Id.* ¶ 24. In issuing the policy and calculating the premium, National Union relied on a submission, prepared by First Capital and based on information provided by the Baldwin Defendants, Gruppuso, NPS, and another broker, which contained the above-described misrepresentations. *Id.* ¶¶ 21, 27. National Union subsequently learned that the loss data provided in the original submission were false. *Id.* ¶ 42. After extensive negotiations took place about renewing the policy, AIMCO ultimately chose not to renew it. *Id.* ¶ 57.

AIMCO sued National Union and others, and National Union asserted a counterclaim against AIMCO and a third-party claim against the Baldwin Defendants for fraud for misrepresentations regarding both the AIMCO entities' loss data and the relationship between AIMCO and the other insured entities.

### C.   Nutmeg's Duty to Defend

The miscellaneous professional liability policy at issue here is akin to an "errors and omissions" policy in that it "provid[es] a specialized and limited type of coverage as compared to comprehensive insurance; it is designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the professions." *Snug Harbor, Ltd. v. Zurich Ins.*, 968 F.2d 538, 543 n.16 (5th Cir. 1992) (citing 7A Appleman,

Insurance Law & Practice § 4504.01).[7]  In determining whether an alleged act

constitutes a "professional service," courts "look not to the title or character of the party

performing the act, but to the act itself."  *Noyes Supervision, Inc. v. Canadian Indem.*

*Co.*, 487 F. Supp. 433, 438 (D. Colo. 1980) (quoting *Marx v. Hartford Accident & Indem.*

*Co.*, 183 Neb. 12, 157 N.W.2d 870, 872 (1968)).

The Policies cover claims against AIMCO for damages or other relief "arising out

of a Wrongful Act," Ex. 4 §§ I, V(1), meaning claims arising out of an act, error or

omission in rendering or failing to render "Professional Services" to others for a fee.  *Id.*

§ V(17).  Such "professional services" are those services "requiring special learning or

intellectual skill" performed by AIMCO (or its agents, subsidiaries and independent

contractors) in the ordinary conduct of its profession and expressly include property

management, loan services and administration, risk management, and insurance

administration.  *Id.* § V(14) & at AIMCO-PL0587.  The Policies expressly exclude from

coverage claims arising from AIMCO's performance of services as an insurance agent

or broker as well as, under the OOPG Policy only, claims arising from AIMCO's failure

to effect or maintain any insurance.  *Id.* at AIMCO-PL0585.

Nutmeg makes four principal arguments in support of its assertion that the

allegations in the underlying complaints do not even arguably or potentially state a claim

within the Policies' coverage and that it thus owes AIMCO no duty to defend it in any of

those lawsuits.  Specifically, Nutmeg argues: (1) none of the underlying suits was

---

[7] To the extent Colorado law on the specific coverage questions at hand is in short supply, I cite
case law from other jurisdictions that are similar to Colorado with respect to the law generally applicable to
an insurer's duty to defend.

brought by an AIMCO client; (2) the claims in *Cananwill*, *WestRM*, *Lumbermens*, and *Highlands* arose from AIMCO's failure to pay its debts and are thus unrelated to AIMCO's provision of professional services to others; (3) the claims in *Lumbermens*, *Highlands*, *National Union*, *First Capital*, and *Basic Capital* arose from AIMCO's procurement of its own loans and insurance and are thus unrelated to AIMCO's provision of professional services to others; and (4) to the extent the claims in the underlying complaints involve AIMCO's procurement of insurance for others, they fall within an exclusion for claims arising out of AIMCO's services as an insurance agent or broker. I will address these arguments in turn.

### 1. *Lawsuits Were Not Brought By an AIMCO Client*

Nutmeg contends it owed no duty to defend AIMCO in any of the underlying lawsuits because none of them were brought by the recipients of professional services from AIMCO; rather, they were all brought by AIMCO's creditors. Def.'s S.J. Br. at 22. However, the language of the Policies does not support this contention. Although coverage extends to claims arising out of acts, errors, or omissions in AIMCO's rendering of "Professional Services" to others, there is nothing that limits such coverage to claims brought by the recipients of those services. Ex. 4 §§ I, V(14), (17). That is, a claim need not necessarily be brought by a client in order to "arise out of" the provision of services to a client.

The Fifth Circuit concluded as much in a case applying Texas law, which is similar to Colorado law with respect to evaluating an insurer's duty to defend. *Administaff, Inc. v. Am. Int'l Speciality Lines Ins. Co.*, 75 Fed. Appx. 239 (5th Cir. 2003). In *Administaff*, the Fifth Circuit held that the duty to defend under a professional liability

25

policy was not limited to claims made by the insured's consumers, as the intent to exclude coverage must be clear and unambiguous and no policy language indicated coverage extended only to "Wrongful Acts" alleged by the insured's "client-consumers." *Id.*; *see also Bank of Calif., N.A. v. Opie*, 663 F.2d 977, 982 (9th Cir. 1981) (professional liability policy made coverage "dependent upon the nature of the insured's conduct, not the status of the party harmed"). Similarly, no language in the Policies extends coverage only to "Wrongful Acts" alleged by AIMCO's client-consumers. Accordingly, Nutmeg's duty to defend is not discharged merely because the plaintiffs and counterclaim defendants in the underlying lawsuits were not AIMCO's clients.

### 2. *Claims Based on AIMCO's Failure to Pay Debts*

Nutmeg contends that *Cananwill*, *WestRM*, *Lumbermens*, and *Highlands* all arose from AIMCO's failure to pay its debts and that AIMCO may not transfer its responsibility for those debts to Nutmeg pursuant to a professional liability policy. To the extent the conduct that forms the basis of the underlying complaints is indeed limited to AIMCO's failure to pay its debts, I agree and find the following three cases instructive.

In *Employers Reinsurance Corp. v. Caswell*, 490 N.W.2d 145 (Minn. Ct. App. 1992), the court evaluated whether an insurance agent's professional liability insurer was required to defend its insured against a lawsuit that arose when the insured was unable to make payments on a promissory note it executed to purchase another agency. The reason the insured was unable to make payments was that an employee had wrongfully diverted funds from the company, and the causes of action against the insured included negligence in maintaining its accounting system and negligently

misrepresenting the cause of its inability to meet its obligations under the note.  *Id.* at

146–47.  The court held that the policy did not cover the claims against the insured, as

they did not "arise out of the conduct of the insured as an insurance agency," but rather

"arose out of the inability of [the insured] to pay a corporate debt."  *Id.* at 148.  The court

further noted that "[p]roperly handling business revenue to ensure that business

expenses are paid is a responsibility of every business.  It is not a professional act

associated with providing insurance services."  *Id.* at 148–49.

*Massamont Insurance Agency, Inc. v. UTICA Mutual Life Insurance Co.*, though

it did not involve failure to pay a debt, is also instructive.  448 F. Supp. 2d 329 (D. Mass.

2006), *aff'd,* 489 F.3d 71 (1st Cir. 2007).  In *Massamont*, an insurance agent was sued

for breach of an exclusive agency agreement based on the agent's transferring his

business from one insurance company to another.  *Id.* at 331.  Under a professional

liability policy, the agent's insurer was required to defend it against suits arising out of

the agent's wrongful acts in rendering or failing to render professional services as an

insurance agent.  *Id.*  The court held that the conduct underlying the agent's alleged

breach—transfer of its accounts to another company—was "not a professional act.  The

decision to perform or not perform did not involve any specialized knowledge or skill, but

rather was simply a business decision."  *Id.* at 332.  To hold otherwise, the court

concluded, would extend coverage under the policy to "[a]ny conceivable business act"

performed by the insured and would convert the policy into "'comprehensive litigation

insurance,' as opposed to the malpractice-type insurance it obviously was intended to

be."  *Id.* at 333.

27

Finally, I find guidance in *Mallalieu-Golder Insurance Agency, Inc. v. Executive Risk Indemnity, Inc.*, No. 4:CV-03-1155, 2006 WL 2322396 (M.D. Pa. Aug. 9, 2006), *aff'd* 2007 WL 4115328 (3rd Cir. Nov 20, 2007), which is the case most factually analogous to the case at hand. The insured in *Mallalieu* was an insurance agency (MG) that sold various insurance policies and financial products. *Id.* at *1. MG's president created a related entity (PFT) for the purpose of financing premiums for policies sold by MG. *Id.* at *3. The arrangement involved PFT's using money obtained through loans from investors to finance the insurance premiums of other, independent outside parties. *Id.* However, at some point MG's president apparently began using PFT to perpetrate a Ponzi scheme, using the cash generated through PFT's operation to meet MG's financial obligations rather than to finance premiums. *Id.* at *4. Eventually, PFT was unable to repay its investors under the promissory notes it had executed, and three class action lawsuits resulted. *Id.*

The issue in the coverage action that followed was whether MG's insurer had a duty to defend it in the three underlying lawsuits under a professional liability policy that covered claims made against MG for "wrongful acts" in performing or failing to perform "professional services," defined in pertinent part as insurance services performed for others for a fee or commission, including premium financing. *Id.* at *6. In holding that the insurer owed no such duty, the court rejected MG's argument that the promissory notes "were part and parcel of a method of premium financing selected by [MG] and, therefore, a means of providing professional services." *Id.* at *9 (citation omitted).

Specifically, the first action, which was for breach of contract and breach of fiduciary duty based on the failure to make payments to the investors pursuant to the

terms of the promissory notes, was unrelated to the performance of professional

services. *Id.* The second action involved third-party claims brought by a securities

broker against MG and certain employees for negligence and fraud in failing to curtail

the known illegal activities going on at PFT and in providing false and misleading

financial information to the broker that was in turn provided to investors. *Id.* at *10.

Again, the court held, such conduct did not involve alleged errors, omissions, or

breaches of duty with regard to the performance of insurance services. *Id.* at *11. The

third action involved investors' claims of negligence against two MG employees for

failing to provide true and accurate information about PFT, including the failure to advise

that the invested funds were being utilized to fund MG's daily operations. *Id.* The court

held that the failure to accurately advise investors regarding the investment of PFT's

assets and the use of its funds was not a "failure to perform insurance services" and

thus the suit was not covered under the policy. *Id.*

Applying the reasoning of these cases, I conclude that the claims in *Cananwill*

and *Highlands* arise entirely from AIMCO's failure to pay its debt under the second

Cananwill PFA and thus are unrelated to AIMCO's acts or omissions in the provision of

professional services to others. First, the claims in the *Cananwill* complaint are based

on AIMCO's failure to repay the amounts loaned to it by Cananwill. *See supra* §

IV(B)(2). Even assuming the purpose of the financing—paying insurance premiums to

National Union—was related to AIMCO's provision of professional services and that

such information could be gleaned from the complaint, it is irrelevant to the "wrongful

conduct" that forms the basis of Cananwill's claims. *Mallalieu*, 2006 WL 2322396, at *9

(failure to repay investors whose investments were source of premium financing did not

arise from performance of insurance services).  Allegations that AIMCO failed to pay its debt to Cananwill and that AIMCO is estopped from denying the validity of the PFA do not even arguably involve "professional acts" associated with AIMCO's provision of services as an REIT.  Rather, the conduct at issue involved, at best, a "business decision" by AIMCO that did not require "special learning or intellectual skill" under the Policies.  *Massamont*, 448 F. Supp. 2d at 332; Policy, Ex. 4 § V(14).

The allegations in *Highlands* similarly revolve around AIMCO's failure to pay the balance due under the Cananwill PFA.  *See supra* § IV(B)(3).  The only distinguishing allegation in the complaint is that AIMCO misrepresented the purpose of the loan for which the bonds were issued.  Ex. 9 ¶¶ 30–31.  However, just as the failure to warn the investors in *Mallalieu* "about the actual use of their investment capital" was not a failure to perform professional insurance services, 2006 WL 2130728, at *11, AIMCO's failure to advise Highlands about the actual use of the money loaned under the Cananwill PFA was not a failure to perform professional services under the terms of the professional liability policy in question.  Thus, Nutmeg owes no duty defend AIMCO in either the *Cananwill* lawsuit or the *Highlands* lawsuit.

AIMCO argues that "the debts and other obligations allegedly giving rise to AIMCO's liability did not arise in a vacuum and cannot be viewed as if they did."  Pl.'s S.J. Resp. (Dkt. # 115) at 29.  In holding that there is no duty to defend in *Cananwill* and *Highlands*, however, I have not viewed AIMCO's debts in a vacuum; rather, I have viewed these debts in the context of the underlying allegations in the complaints.  In comparing those allegations to the policy terms, as is required by Colorado law, I find

that the claims in these suits are not even arguably covered under the Policies. Thus, under *Hecla*, there is no duty to defend.

The conduct underlying the claims in the *WestRM* and *Lumbermens* complaints, however, is not limited to AIMCO's mere failure to pay its debts. The allegations in *WestRM* describe an elaborate scheme to defraud insurance companies, lenders, surety companies, and parties for whom AIMCO obtained insurance. Ex. 6 ¶ 223. The alleged facts underlying this scheme that are detailed in the complaint are relevant to, for example, the claims of fraud and negligent supervision. While AIMCO's default on the WestRM PFAs may have been the precipitating factor in WestRM's filing the lawsuit and Greenwich and XL's filing their third-party claims against AIMCO, the default is by no means the only act related to those claims. Nonetheless, as discussed further below, to the extent these allegations go beyond the mere failure to pay debts, they are either simply background/context or are otherwise not covered by the Policies.

Similarly, the *Lumbermens* allegations arise out of both AIMCO's failure to pay its debts and its alleged fraudulent conduct with respect to the AIMCO Program, in which the Lockton clients were participants. Ex. 7 ¶¶ 23, 33. In fact, some of the claims in *Lumbermens* were brought on behalf of the Lockton clients, such as the fraud claim against AIMCO and the other defendants with respect to the premiums charged and coverage provided in the AIMCO Program. *Id.* ¶ 125. These allegations go beyond AIMCO's failure to fulfill its obligations under the PFAs at issue. However, as with *WestRM,* conduct other than the failure to pay debts is either not covered or falls within policy exclusions, discussed further below.

Accordingly, I agree with Nutmeg that *Cananwill* and *Highlands* arise entirely out of AIMCO's failure to pay its own debts and this conduct does not fall within the coverage of the Policies. In addition, most of the allegations in the *WestRM* and *Lumbermens* lawsuits concern the same type of non-covered activities; what remains, as discussed below, is also excludable or not covered on other grounds.

### 3. *Claims Based on AIMCO's Procurement of Insurance*

Nutmeg next argues that *Lumbermens*, *Highlands*, *National Union*, *First Capital*, and *Basic Capital* involve claims related to AIMCO's procurement of its own insurance, which necessarily does not constitute the provision of professional services "for others for a fee," and thus the claims do not trigger coverage under the Policies. Def.'s S.J. Br. at 29. AIMCO responds that there are numerous allegations in the complaints "of AIMCO's responsibility for Baldwin's acts in providing risk management and insurance consulting services not only for AIMCO, . . . but also for parties unrelated to AIMCO." Pl.'s S.J. Resp. at 29 (emphasis omitted). I agree with Nutmeg that AIMCO's procurement of its own property insurance does not involve the provision of professional services "for others for a fee." While procuring and maintaining such insurance may be integral to AIMCO's ability to do business, presumably so is hiring its employees and purchasing office equipment, neither of which could reasonably be considered to arise out of the provision of professional services for others for a fee. And the mere fact that maintaining property insurance may be particular to AIMCO's status as an REIT, as opposed to any business in general, does not bring it within the terms of AIMCO's professional liability policy.

I also agree with Nutmeg that the claims in the underlying lawsuits arise, *at least in part*, out of AIMCO's procurement of its own property insurance. However, although the AIMCO Program described in many of the underlying complaints apparently originated with the purchase of an insurance policy for AIMCO that listed AIMCO and its affiliates as named insureds, Ex. 6 (Part 2) ¶ 51, the alleged scheme that forms the basis of many of the claims appears to have begun when unaffiliated insureds were improperly and unlawfully added to AIMCO's policy, which, among other things, reduced the amount of AIMCO's premiums. *WestRM*, Ex. 6 (Part 2) ¶¶ 52–53; *Lumbermens*, Ex. 7 ¶ 19; *Basic Capital*, Ex. 11 ¶ 3.03; *First Capital*, Ex. 13 ¶ 29; *National Union*, Ex. 15 at 2. To the extent such conduct allegedly originated with Baldwin or Gruppuso, several of the complaints also allege that Baldwin, S&B, Gruppuso, and/or NPS acted on AIMCO's behalf or conspired and collaborated with AIMCO in implementing the program. Ex. 6 (Part 2) ¶¶ 38, 49, 52; Ex. 7 ¶¶ 16, 19; Ex. 11 ¶¶ 4.05, 4.06; Ex. 13 ¶ 29; Ex. 15 ¶ 65. Thus, the complaints allege that AIMCO, through Baldwin and/or Gruppuso, performed certain services "for others for a fee" as opposed to only procuring its own insurance.

In light of this conclusion, I turn to Nutmeg's alternative argument that, to the extent the claims in the underlying suits arise out of AIMCO's procurement of insurance for others, such claims fall within the Policies' exclusion from coverage for claims arising from AIMCO's performance of services as an insurance agent or broker. Ex. 4 at AIMCO-PL0585. AIMCO argues that Nutmeg has waived or is estopped from asserting this exclusion as a coverage defense, as it is not mentioned as a basis for the denial of coverage in several of the denial letters, and Nutmeg "pressed no argument based on it"

until it filed its objections to the Magistrate Judge's Recommendation. Pl.'s S.J. Resp. at 37. This argument is based on well-settled Colorado law that "an insurer must raise or reserve all defenses known to it within a reasonable time or those defenses may be waived or the insurer may be estopped from asserting them." *Liberty Ins. Underwriters, Inc. v. Westport Ins. Corp.*, No. 04-cv-01856-WYD-BNB, 2006 WL 2130728, at *2 (D. Colo. July 28, 2006) (citing *United States Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 210 n.3 (Colo. 1992)).

However, "'while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage, or restrictions on coverage, cannot be extended by the doctrine of waiver or estoppel.'" *Id.* (quoting *Hartford Live Stock Inc. v. Phillips*, 150 Colo. 349, 372 P.2d 740, 742 (1962)). Thus, while an insurer may waive a defense to coverage such as lack of notice, it may not waive application of a policy exclusion "because the doctrines of waiver and estoppel cannot be used to create coverage where none previously existed under the terms of the policy." *Id.* (citing *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 620 (Colo. 1999)). Accordingly, Nutmeg did not waive its right to rely on the insurance brokerage exclusion, and I will address the merits of the exclusion's applicability.

The Colorado Supreme Court has prescribed an insurer's burden to demonstrate that it is not obligated to defend its insured because of an exclusion to coverage:

> "In order to avoid policy coverage, an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretation. The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy. An insurer is not excused from its duty to defend unless there is no

34

> factual or legal basis on which the insurer might eventually be held liable
> to indemnify the insured."

*Compass Ins. Co.*, 984 P.2d at 614 (quoting *Hecla*, 811 P.2d at 1090).  Thus, Nutmeg is entitled to summary judgment based on the applicability of the claimed exclusion only if the complaints' allegations giving rise to AIMCO's potential liability are based solely on AIMCO's performance of services as an insurance agent or broker.

The terms "insurance agent" and "insurance broker" are not defined in the Policies.  Case law defines an insurance broker as "an individual who procures insurance and acts as a middleman between the insured and the insurer . . . and who . . . places the insurance with the company selected by the insured, or in the absence of any selection by the insured, with a company he selects himself."  *United Gen. Title Ins. Co. v. AmeriTitle, Inc.*, 847 N.E.2d 848, 856 (Ill. Ct. App. 2006) (citations and internal quotation marks omitted); *see also Spanish Transp. Serv. Corp. v. Hurd Ins. Agency*, 2006 WL 3432858, at *2 (N.J. Super. Ct. App. Div. Nov. 30, 2006) (unpublished opinion) ("The obligations of an insurance broker have been defined to include procuring insurance, securing a policy that is neither void nor materially deficient, and providing the coverage that the broker undertook to obtain.") (citing *Rider v. Lynch*, 42 N.J. 465, 476 (1964)).  Under Colorado law, "where an insurance agency undertakes to secure specific coverage or leads a policyholder to believe certain coverage has been obtained, if the coverage is not included in the policy, it is liable for its negligence."  *Pete's Satire, Inc. v. Commercial Union Ins. Co.*, 698 P.2d 1388, 1390 (Colo. App. 1985) (citations omitted).

Nutmeg is accordingly entitled to summary judgment on its duty to defend only if the allegations giving rise to AIMCO's potential liability for its provision of services "for others" arise solely from its procurement of insurance on their behalf, which includes placing the insurance with a particular company and securing a policy that is valid and that comports with the procurer's representations regarding the policy terms. I hold that the exclusion forecloses Nutmeg's duty to defend AIMCO against the claims in *Basic Capital*, *National Union*, *Lumbermens*, *First Capital*, and *WestRM*.

The allegations in the *Basic Capital* suit, brought by two of the unaffiliated insureds added to AIMCO's policies, revolve around the defendants' failure to provide the insurance for which they had contracted and their misrepresentations regarding the nature and terms of the policies to which the insureds were added. *See generally* Ex. 11. Thus, the *Basic Capital* allegations are limited to AIMCO's, S&B's, and NPS's conduct in procuring insurance for the plaintiffs and thus arise solely from their activities as insurance brokers as those terms are defined by relevant case law. Similarly, the *National Union* allegations only involve AIMCO's alleged fraud in procuring the property insurance policy from National Union by misrepresenting both the affiliation of the other covered entities and the value and loss data of the covered properties. *See* Ex. 15. Because the allegations do not go beyond AIMCO's procurement of insurance, they are limited to AIMCO's activities as an insurance broker.

The alleged wrongdoing in *Lumbermens* stems initially from defendants' "failure to obtain the insurance coverage and rates that had been promised" to the unaffiliated insureds. Ex. 7 ¶ 38. Moreover, the allegedly unauthorized bonds issued by Lumbermens were obtained as part of AIMCO's, the Baldwin Defendants', and

36

Lockton's attempt to limit their exposure for the losses resulting from that failure. Thus, to the extent the allegations in *Lumbermens* go beyond AIMCO's failure to repay its debts, they are limited to AIMCO's conduct in procuring insurance for others and its alleged attempt to transfer any potential liability for that conduct to others, including Lumbermens.

Similarly, the remaining allegations in *WestRM,* to the extent they describe the activities and underlying scheme that ultimately resulted in the procurement of the financing from WestRM via to the PFAs, do not trigger Nutmeg's duty to defend for the same reason. Again, the acts underlying the fraud scheme almost entirely relate to the purchase of insurance for AIMCO itself, or the AIMCO parties acting as insurance brokers for others, or activities that otherwise do not constitute the provision of professional services for others for a fee, as defined by the Policies, because they are simply routine business tasks like paying invoices or obtaining financing, not services requiring special learning or intellectual skill.

The *First Capital* allegations in part involve AIMCO's provision of allegedly inaccurate information to First Capital, itself an insurance broker, which First Capital then forwarded to insurance companies in connection with its activities in assisting with procurement of AIMCO's insurance coverage. Ex. 13 ¶¶ 26, 31–35. Such allegations at best involve AIMCO's procurement of insurance for others and fall within the "insurance broker" exclusion. Although First Capital also complains that AIMCO fraudulently obtained funds through PFAs based on inaccurate information and converted them to its own use rather than pay the premium due, I conclude that these allegations do not trigger a duty to defend. AIMCO's obligation to ensure the premiums

on its insurance policies are paid is not a service performed for others requiring "special learning or intellectual skill," but is rather a routine business function (i.e., paying an invoice). Accordingly, the allegations in these cases indicate that they are outside the scope of coverage or fall within the Policies' exceptions.

### 4. *Conclusion on Duty to Defend*

For the foregoing reasons, I conclude that Nutmeg did not have a duty to defend AIMCO in the underlying suits.

## V. DUTY TO INDEMNIFY AND BAD FAITH CLAIMS

Nutmeg's assertion that it is entitled to summary judgment on AIMCO's duty-to-indemnify claim is premised on my first finding that Nutmeg has no duty to defend AIMCO in the underlying lawsuits. As noted above, the duty to indemnify is broader than the duty to defend. *Hecla*, 811 P.2d at 1089 & n.5. Thus, because there is no duty to defend AIMCO, there is also no duty to indemnify.

Similarly, AIMCO's bad faith claims cannot stand to the extent there is no duty to defend, as the central issue in this kind of bad faith claim under Colorado law is whether "'a reasonable insurer under the circumstances [would] have denied or delayed payment of the claim under the facts and circumstances.'" *TPLC, Inc. v. United Nat. Ins. Co.*, 44 F.3d 1484, 1496 (10th Cir. 1995) (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 (Colo. 1985)). Accordingly, as with the claims for duty to indemnify, Nutmeg is entitled to summary judgment on AIMCO's bad faith claims because Nutmeg owes no duty to defend the underlying suit.

**VI.  CONCLUSION**

For the foregoing reasons, it is ORDERED that the Recommendation of United States Magistrate Judge (Dkt. # 77) is ACCEPTED IN PART in accordance with this order.  Plaintiff AIMCO's Motion for Partial Summary Judgment on Breach of the Duty to Defend (Dkt. # 31) is DENIED.  Defendant's Motion for Summary Judgment (Dkt. # 101) is GRANTED.  All other pending motions are denied as moot.

DATED at Denver, Colorado, on March 31, 2008.

BY THE COURT:


s/ Walker D. Miller
United States District Judge